IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Gary W. Woods, et al.,

        Plaintiffs,

    v.

FacilitySource LLC, et al.,

        Defendants.

Case No: 2:13-cv-621

Judge Graham

Magistrate Judge Deavers

<u>Opinion and Order</u>

This employment discrimination action is before the court on defendants' motion for summary judgment. Plaintiff Gary Woods, who is an African American, alleges that he was subject to racial discrimination and a hostile work environment while he was employed as an account manager at defendant FacilitySource LLC in Columbus, Ohio. Plaintiff Nicolas Lorenzo, who is Caucasian and is employed as an account manager at FacilitySource, alleges that he was subject to discrimination and a hostile work environment based upon his association with Woods. Both plaintiffs allege that the discrimination took the form of them receiving lower wages than other account managers.

As will be discussed below, defendants have articulated legitimate non-discriminatory reasons for the pay differential between plaintiffs and other account managers, and plaintiffs have failed to produce evidence from which a jury could reasonably find that such non-discriminatory reasons were pretextual. Further, the alleged incidents of harassment do not rise to the level of a hostile work environment as a matter of law. Accordingly, the court grants defendants' motion for summary judgment.

## I.  Background

FacilitySource provides facility maintenance services to a range of businesses, including department stores and quick service restaurants. Decl. of William Hayden, ¶ 2. Since 2005 FacilitySource has experienced "rapid growth, averaging 25-30% growth each year," and a private equity firm purchased a majority interest in the company in 2012. Id., ¶¶ 4, 5. Defendant William Hayden is the President and Chief Executive Officer of FacilitySource, and defendants Duane Smith and Jordan Wagner are management-level employees. Id., ¶ 6.

Plaintiff Woods began his employment with FacilitySource in September 2005 as a customer service representative and earned a starting salary of $10 per hour.  See Woods Dep., Ex. 7.  After several promotions, Woods was promoted to account manager in October 2009 with an annual salary of $40,000.  See Woods Aff., ¶ 13; Doc. 71, Page ID 1158.   He received raises in April 2010 and April 2011 that brought his salary to $41,200 and then $42,200.  See Woods Dep., Ex. 7. Woods received generally positive work performance reviews.  See id., Exs. 8-12.  After this lawsuit was filed, FacilitySource terminated Woods on March 31, 2014 on the grounds that it discovered that he had made the following two misrepresentations on his employment application: (1) that he had earned a high school diploma and (2) that he left his former employer because of a reduction in work hours.  See id.., Ex. 1; Woods. Aff., ¶¶ 21, 22.

Plaintiff Lorenzo began his employment with FacilitySource in October 2005 as a customer service representative and earned a starting salary of $11 per hour.  See Lorenzo Dep., Ex. 20.  After several promotions, Lorenzo was promoted to account manager in March 2008 with an annual salary of $36,000.  See Id.; Lorenzo Aff., ¶ 12.  He received several raises that has brought his salary to $42,700.  See Lorenzo Dep., p. 91; Lorenzo Dep., Ex. 20.  Lorenzo has received positive work performance reviews, see id., Exs. 21, 28-30, and he remains employed by FacilitySource.

Plaintiffs allege their situation at work changed for the worse after defendant Wagner was promoted to Director of Market-Retail in July 2009 and defendant Smith was hired as Vice President of Client Services in July 2010.  See Doc. 68-7, Response to Interrogatory No. 3; Doc. 68-8, Response to Interrogatory No. 3.  Woods alleges that the only promotions he received occurred prior to 2010 and that he did not receive a merit-based pay increase after 2011.  Woods Aff., ¶ 9, 17. Lorenzo similarly alleges that he did not receive a promotion after 2009 and did not receive a merit-based pay increase after 2011.  Lorenzo Aff., ¶ 8, 13.

According to plaintiffs, the result of FacilitySource's failure to promote them or grant them pay increases is that they earned lower salaries than did other account managers.  Plaintiffs state that at the time of Woods's termination, their salaries were the lowest and second lowest among account managers even though they had more seniority than all other account managers.  See Woods Aff., ¶ 25; Lorenzo Aff., ¶ 15.  Woods contends that he earned less than other account managers because of racial discrimination, and Lorenzo contends that he earned less than other account managers because of his association with Woods.  Plaintiffs allege that their advancement was impeded by a lack of support from Smith and Wagner, see Woods Dep. pp. 124-25; Lorenzo Dep., pp. 10-13, 50-51, and that Smith discouraged Woods from applying for advancement, see Woods Aff., ¶ 55.

FacilitySource responds that when plaintiffs became account managers in 2008 and 2009, a college degree was not required for the position. See Woods Dep., pp. 291-92. In 2010, FacilitySource implemented minimum qualifications that included a two-year degree or prior account management experience in the facility maintenance field. See id., Ex. 13. According to William Hayden, "As the Company grew, it began recruiting more seasoned employees. To attract a higher level of talent, FacilitySource needed to become more competitive in the market, and this meant that the Company began to hire Account Managers at a higher rate than previous Account Managers were being paid." Hayden Decl., ¶ 8. FacilitySource concedes that account managers hired from 2010 to 2012 were, on average, paid more those hired between 2005 and 2009. Id., ¶ 9.

Plaintiffs contend that Smith and Wagner discouraged other employees from associating with Woods. See Woods Dep., p. 176; Woods Aff., ¶ 26 (stating that defendants "encouraged coworkers to disassociate with me and treated coworkers that did associate with me poorly."); Lorenzo Aff., ¶ 17. They further contend that management was more demanding of Woods than they were of other employees. See Woods Aff., ¶ 26 ("Duane Smith and Jordan Wagner had a different, higher level of expectation and demands for me.").

Plaintiffs also claim that Smith and Wagner made negative racial remarks to Woods. Smith told Woods that "you people are cheeky" and "you people are dramatic" and said something suggesting that Woods liked fried chicken and Kool-Aid. See Woods Aff., ¶¶ 30, 58. Smith also commented to Woods that he looked like Dizzy Gillespie, had "nappy" hair, and was a "dark cloud." See Woods Dep., pp. 218-20, 224-28. Smith once placed his leg on Woods's desk in a sexually suggestive manner. See Woods Aff., ¶ 57. Wagner used the phrase "you people" once when talking to Woods, see Woods Dep., p. 212-13, and attempted to stop Woods from going to parts of the building where other employees could go, see Woods Aff., ¶ 34.

According to plaintiffs, they were singled out for exclusion from a company golf outing in September 2012. Hayden, Smith and Wagner participated and other account managers were invited to attend, along with many clients of FacilitySource. Doc. 71, Page ID 1160-61. One of those clients, Family Christian, was an account to which Woods was assigned. Woods Dep., p. 162. Woods and Lorenzo had expressed interest to Brent Myers, director of human resources, about attending the golf outing but they were not invited. Id., pp. 165-66.

Plaintiffs filed this suit in June 2013. The complaint asserts claims under Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e, et seq., and under 42 U.S.C. § 1981 for racial

discrimination, race-based association discrimination and a hostile work environment, as well as parallel claims under state law.

During discovery, FacilitySource obtained information it believes shows that Woods made material misrepresentations in his job application materials.  In a deposition in February 2014, Woods testified that he graduated from Asheville High School in North Carolina.  See Woods Dep., p. 12-13.  In March 2014, FacilitySource obtained a statement from the Registrar at Asheville High School stating that Woods did not earn enough credits to graduate and obtained a document from Woods's former employer indicating that he was terminated because of a misstatement on his application.  See Hayden Decl., Ex. 1.  Defendants were granted leave to file a counterclaim for fraudulent inducement.  The counterclaim alleges that Woods submitted two applications in which he falsely stated that he had received a high school diploma and that his reason for leaving his previous employment was a reduction in work hours.  According to the counterclaim, FacilitySource gave Woods an opportunity to rebut the records it had obtained, but he did not respond. FacilitySource terminated Woods on March 31, 2014.  Woods does not challenge his termination in this lawsuit.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009).  The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465.  "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment."  Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248).  Accordingly, the nonmoving party must present "significant probative evidence"

to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III. Discussion

### A. Administrative Exhaustion of Title VII Claims

In order to bring a Title VII action in federal court, a plaintiff must (1) timely file a charge of employment discrimination with the Equal Employment Opportunity Commission and (2) receive and timely act upon the EEOC's right-to-sue letter. Puckett v. Tennessee Eastman Co., 889 F.2d 1481, 1486 (6th Cir. 1989) (citing 42 U.S.C. § 2000e-5(f)(1) and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973)). Here, defendants argue that plaintiffs merely completed intake questionnaires and never filed charges with the EEOC. Defendants note that the charge forms of record were not signed.

Woods and Lorenzo both signed and filed intake questionnaires with the EEOC in March 2013. See Doc. 68-27. The completed questionnaires described the basis of the alleged discrimination and alleged that Smith and Wagner were the individuals responsible. Accompanying the questionnaires were signed, verified letters, see id. (declaring under penalty of perjury that the letters were true and correct), providing more details of the alleged discrimination, identifying plaintiffs' legal counsel, and requesting that the EEOC treat the questionnaires and letters as charges of discrimination.

Plaintiffs then received letters from the EEOC stating, "Because the document you submitted to us constitutes a charge of discrimination, we have complied with the law and notified

5

the employer that you filed a charge." Doc. 68-28. The letters provided plaintiffs with the EEOC charge number that each of their charges had been assigned. The letters further stated that the EEOC would begin its investigation. Attached to these letters were charge forms that the EEOC had itself filled out (based upon the information plaintiffs had provided) and that plaintiffs were asked to sign and return. See id. There is no evidence that plaintiffs did sign and return the charge forms. In late May 2013, the EEOC issued right-to-sue letters to both plaintiffs. See Doc. 68-29.

The court finds that plaintiffs satisfied the requirement of filing a charge. It is true that a questionnaire alone will not constitute the filing of a charge if it does not satisfy § 2000e-5(b)'s requirements of a "writing under oath or affirmation" and notice to the employer of the claim being alleged. See Pijnenburg v. W. Ga. Health Sys., Inc., 255 F.3d 1304, 1306-07 (11th Cir. 2001); Park v. Howard Univ., 71 F.3d 904, 908-09 (D.C. Cir. 1995); Proffit v. Keycom Electronic Publ'g, 625 F.Supp. 400, 403 (N.D. Ill. 1985). Here, however, plaintiffs provided sworn signatures in the letters they submitted with the questionnaires and the EEOC gave FacilitySource notice of the charges. The materials submitted by plaintiffs requested agency action and were sufficiently specific as to easily satisfy the requirement in 29 C.F.R. § 1601.12(b) that a charge be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." Moreover, the EEOC treated the plaintiffs' submissions as charges of discrimination. These facts place this situation well within the body of case law finding that the charge requirement is met by a questionnaire and accompanying materials when together they satisfy all of the legally-required elements of a charge. See e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1321 (11th Cir. 2001); Semsroth v. City of Wichita, 304 Fed. App'x 707, 713-14 (10th Cir. 2008); Tucker v. Howard Univ. Hosp., 764 F.Supp.2d 1, 7-8 (D. D.C. 2011); see also Federal Express Corp. v. Holowecki, 552 U.S. 389 (2008). That plaintiffs did not sign the charge forms later sent to them by the EEOC does not change the conclusion, because they had already verified the earlier submissions. See Wilkerson, 270 F.3d at 1317 ("At the end of her intake questionnaire, Wilkerson signed the following statement: 'I swear or affirm under penalty of perjury that the provided information is truthful and correct to the best of my knowledge.' . . . This declaration plainly satisfies the verification requirements of Title VII and EEOC regulations.").

Defendants make one other argument, this one based on the scope of the charge. "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 361 (6th Cir. 2010) (citing 42 U.S.C. § 2000e-5(f)(1)). Defendants argue that Lorenzo's charge form related to gender discrimination and

not race-based association discrimination.  This argument is not persuasive.  The charge form, which the EEOC prepared, did in fact incorrectly characterize the nature of charge as having a gender component.  See Doc. 68-28.  However, the form additionally and accurately stated that the alleged discrimination related, at least in part, to Lorenzo's association with Woods.  More importantly, Lorenzo's questionnaire and accompanying letter expressly complained of race-based association discrimination.  See Doc. 68-27 (averring that he was subjected to discrimination "due to my association with an African-American co-worker").  Thus, Lorenzo gave proper notice of the nature of the claims he asserts in this lawsuit.

### B.  *McDonnell Douglas* **Framework**

Plaintiffs assert claims under Title VII and Ohio Revised Code § 4111.17 for wage discrimination.[1]  Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e–2(a)(1).  Title VII also forbids discrimination on the basis of association with a protected party.  Barrett v. Whirlpool Corp., 556 F.3d 502, 511 (6th Cir. 2009).

A claim of discrimination may be proven using either direct or circumstantial evidence.  Kuhn v. Washtenaw Cnty., 709 F.3d 612, 624 (6th Cir. 2013).  "Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Id. (internal quotation marks omitted).  Where, as here, there is an absence of direct evidence of discrimination, courts apply the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Davis v. Cintas Corp., 717 F.3d 476, 491 (6th Cir. 2013).

Under McDonnell Douglas a plaintiff must first make out a *prima facie* case of discrimination.  Davis, 717 F.3d at 491.  To do so, plaintiff must establish that: (1) he is a member of a protected class, (2) he was subject to an adverse employment action, (3) he was qualified for the position, and (4) other, similarly situated and outside the protected class, were treated differently.  Loyd v. Saint Joseph Mercy Oakland, 766 F.3d 580, 589 (6th Cir. 2014).

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision.  Id. at 590.  "The plaintiff then bears the burden of demonstrating that the proffered reason was in fact a pretext designed to conceal unlawful discrimination.  Pretext can be shown by offering evidence that (1) the

---

[1]  The complaint does not assert a claim under the federal Equal Pay Act, 29 U.S.C. § 206(d), though claims under the Ohio statute are analyzed in the same manner as claims brought under the federal Act.  See Birch v. Cuyahoga Cnty. Probate Ct., 392 F.3d 151, 161 n. 6 (6th Cir. 2004); Hollowell v. Society Bank & Trust, 78 Ohio App.3d 574, 605 N.E.2d 954 (Ohio App. 1992).

employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." Id. (citing Wexler v. White's Fine Furniture, Inc.., 317 F.3d 564, 576 (6th Cir. 2003) (en banc)).

###### C.   Wage Discrimination

Pay disparities between a black employee and a similarly situated white employee can serve as the basis for a Title VII claim. Bazemore v. Friday, 478 U.S. 385, 395–96 (1986). The analysis of a Title VII wage discrimination claim is essentially the same as it would be under the Equal Pay Act. Odomes v. Nucare, Inc., 653 F.2d 246, 250 (6th Cir. 1981). A plaintiff may establish a *prima facie* case of wage discrimination by showing an employer paid higher wages to an employee outside of the protected class for substantially equal work. Kovacevich v. Kent State Univ., 224 F.3d 806, 826 (6th Cir. 2000). It is then the employer's burden to establish that the wage differential is justified by one of the four affirmative defenses set forth in the Equal Pay Act. Beck-Wilson v. Principi, 441 F.3d 353, 369 (6th Cir. 2006). These defenses are: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any factor other than race. 29 U.S.C. § 206(d)(1). If the employer establishes an affirmative defense, the employee then bears the burden of producing evidence sufficient to create a genuine dispute as to whether the employer's proffered reason is pretextual. Balmer v. HCA, Inc., 423 F.3d 606, 613 (6th Cir. 2005).

Here, defendants do not dispute that plaintiffs are able to make out a *prima facie*. Before the court is a chart (hereinafter the "Account Manager Chart") produced by FacilitySource during discovery showing that 16 other account managers, all Caucasian, earned more than plaintiffs did at various points in the time from when plaintiffs became account mangers until the filing of this suit. See Doc. 71, Page ID 1158.

Defendants' motion for summary judgment is based on its assertion of an affirmative defense. They argue that the wage differential between plaintiffs and other account managers is based on a merit system of pay. Defendants argue that the merit system's impact became pronounced as a result of FacilitySource's effort in 2010 to attract better talent to the position by increasing the qualifications and offering better pay. They argue that plaintiffs were hired in 2005 when the company had just begun operating and that other employees who became account managers in the 2005 to 2009 timeframe and had similar qualifications as plaintiffs earned wages similar to, and in some cases less than, what plaintiffs earned. To the extent there are exceptions to the general rule (i.e., employees who became account managers before 2010 but earned more than

plaintiffs), defendants argue that those exceptions do not demonstrate pretext. They argue that the exceptions instead represent individuals whose credentials, in terms of education and experience, exceeded those of plaintiffs and who were thus paid more than plaintiffs.

The court finds that defendants have established an affirmative defense. FacilitySource grew rapidly and in 2010 implemented minimum qualifications that included a two-year degree or prior account management experience in the facility maintenance field. See Woods Dep., Ex. 13; Hayden Decl., ¶ 4. FacilitySource began recruiting a "higher level of talent . . . and this meant that the Company began to hire Account Managers at a higher rate than previous Account Managers were being paid." Id., ¶ 8.

The Account Managers Chart and accompanying materials confirms FacilitySource's explanation concerning wage differentials. The Chart lists 26 individuals who were hired at the account manager position from August 2005 to the filing of the lawsuit in June 2013.[2] See Doc. 71, Page ID 1158. There were 7 individuals, outside the protected class and hired before or around the same time as plaintiffs, who earned less than plaintiffs did, and there was one other account manager who earned a wage in between Woods's and Lorenzo's salaries. Lorenzo became an account manager in April 2008 and Woods in October 2009. Two other individuals – Joshua Dean and Zachary Stewart – became account managers in that time span, and they earned less than plaintiffs. Dean and Stewart earned $37,500 and $36,100 respectively, while Lorenzo earned $36,000 when he was first promoted to account manager and Woods earned $40,000. See id.; Woods Aff., ¶ 13; Lorenzo Aff., ¶ 12. Through pay increases, Lorenzo's salary exceeded that of Dean and Stewart. See Doc. 71, Page ID 1158.

Woods earned $42,200 when this suit was filed and Lorenzo earned $42,700. Individuals who were hired as account managers from December 2010 to June 2012 earned wages from $46,700 to $60,000. Id. The qualifications of the individuals hired from December 2010 to June 2012 exceeded plaintiffs' qualifications in terms of educational background and prior account management experience, see Second Hayden Decl., ¶¶ 2-10, and plaintiffs do not attempt to demonstrate otherwise.[3]

---

[2] There is a 27th individual, Brian Warner, for whom FacilitySource did not have data.
[3] For example, account manager Kitty Wood, who was hired in 2011, had a degree in business management and ten years of management experience. Account manager Jill Eberhardt, who was hired in 2012, had a degree in business administration and fifteen years of account management experience.

9

Plaintiffs instead base their argument on seniority. Plaintiffs argue that defendant's explanation of its pay structure is pretextual because plaintiffs had more seniority than the other account managers but, at the time the lawsuit was filed, earned less than all except Stewart.[4] This argument stems from plaintiffs' opinion that seniority should be the predominant factor in how FacilitySource compensates its account managers. See Woods Aff., ¶ 25; Lorenzo Aff., ¶ 15. But this opinion is only that – an opinion about how FacilitySource should run its business. The record establishes that FacilitySource determined that seniority at the company would not be a substantial factor in calculating account manager's salary; rather, relevant education and business experience are given greater weight. See Hayden Decl., ¶¶ 8, 18, 19; Second Hayden Decl., ¶¶ 2-18 (reviewing pay and qualifications of various account managers). In the absence of evidence of racial discrimination in FacilitySource's selection of these factors in making salary decisions, the court will not second guess the employer's business judgment. See Udoewa v. Plus4 Credit Union, 754 F.Supp.2d 850, 878 (S.D. Tex. 2010) ("[C]ourts defer to the business judgment of the employer unless there is strong evidence of discrimination.") (citing cases).

Plaintiffs further argue that there are exceptions to defendants' purported pay system – exceptions that show that the system has no basis in fact. The evidence, however, does not support plaintiffs' argument. FacilitySource did hire some account managers in 2007 and 2008 who earned more than plaintiffs. Plaintiffs identify Stephen Zerucha, who was hired in October 2007 and earned a salary of $46,800, and Josh Holecko, who was hired in June 2007 and earned $60,000. The record demonstrates that both Zerucha and Holecko had much stronger credentials than those of plaintiffs. Zerucha attended Ohio State University and Columbia University, where he studied business (but did not earn a degree), and he had served as a general manager for several companies, was an operating partner in a business, and had experience training employees. See Doc 71-2, PAGE ID 1185-86. Holecko held a business administration degree from Youngstown State University and had many years of experience in sales representative and account manager positions at other companies. Id., PAGE ID 1182-83. Woods, in contrast, did not have a high school diploma (though FacilitySource believed that he did) and lacked experience in account management.

---

[4] Plaintiffs' attempt to argue that Stewart himself was discriminated against because of his association with Woods is not supported by the evidence. Stewart stated that he was friends with Woods for a period, but that he stopped interacting with Woods because of a personality conflict. Stewart Dep., pp. 29-31. Stewart testified that he was not treated differently by Smith and Wagner because of his friendship with Woods, nor was he encouraged to disassociate himself from Woods. Id., pp. 31-32, 49.

See Woods Dep. Ex. 1. Lorenzo held a college degree, but it was in the unrelated field of fine arts, and he likewise lacked experience in account management. See Lorenzo Dep., Ex. 22. Far from demonstrating pretext, these exceptions show that FacilitySource followed a merit system even before 2010.

Finally, plaintiffs argue that a wage discrimination claim is established by looking to the comparator of David Sigmund. Sigmund began working for FacilitySource in 2007 as a customer service representative and at a salary of $20,800. See Second Hayden Decl., ¶ 11. He has a high school diploma and attended college, studying communications, but did not receive a college degree. See Doc. 71, PAGE ID 1166. He lacked account management experience prior to working for FacilitySource but had some experience in sales, in being a supervisor, and in training employees. See id., PAGE ID 1167. Sigmund was promoted to account manager in January 2013 at a salary of $43,004. See id., Page ID 1158.

The court finds that the wage differential between Lorenzo and Sigmund to be too minimal to support a wage discrimination claim. Sigmund earned $300 per year more than Lorenzo, which amounts to a difference of seven-tenths of one percent. Courts have found that marginal differences in salaries, standing alone, are insufficient to sustain a claim of wage discrimination. See, e.g., Sims-Fingers v. City of Indianapolis, 493 F.3d 768, 771 (7th Cir. 2007); Brousard-Norcross v. Augustana College Assoc., 935 F.2d 974, 979 (8th Cir. 1991); Flockhart v. Iowa Beef Processors, Inc., 192 F.Supp.2d 947, 971-72 (N.D. Iowa 2001). In Sims-Fingers, the plaintiff, a female earned $34,374 as a city park manager, while a male park manager earned $35,000. The Seventh Circuit held that the defendant was entitled to summary judgment against plaintiff's Equal Pay Act claim: "The smaller the differential, the more likely it is to be justified by a small difference in the work. The pay differential between the plaintiff and [defendant] is less than 2 percent, and we do not see how anyone could say that her work and his are so far equal that it should be inferred that he is overpaid relative to her." 493 F.3d at 771. Accord Flockhart, 192 F.Supp.2d at 971 (holding that an hourly wage differential of five cents did not establish an Equal Pay Act claim).

The court finds too that Woods has not established a claim. While the differential between Woods and Sigmund (1.87%) is larger than the differential between Lorenzo and Sigmund (0.7%), it is still equivalent to the differential in Sims-Fingers (1.79%) that was found to be insufficient to establish a claim. Moreover, the differential is minimal when comparing the salaries of plaintiffs and Sigmund to the other account manager who is an appropriate comparator, Zachary Stewart. Like plaintiffs and Sigmund, Stewart started as a customer service representative at FacilitySource, earning

$19,760.  See Second Hayden Decl., ¶ 14.  And like plaintiffs and Sigmund, Stewart was internally promoted to account manager, earning $36,100 when this suit was filed.  See id., ¶ 15; Doc. 71, PAGE ID 1158.  The wage differential between Woods and Stewart is 14%.  Given the small comparator class and the variance that existed between Woods and Stewart, the differential between Woods and Sigmund does not establish wage discrimination.  See Brousard-Norcross, 935 F.2d at 979 (holding that wage discrimination claim was not established where the differential between plaintiff and one comparator was marginally small and plaintiff earned more than another comparator); Flockhart, 192 F.Supp.2d at 971 (holding that claim was not established where comparator class was small and the employer's pay structure allowed for pay variation).

Even if the differential in pay between Woods and Sigmund could be viewed as more than minimal, the record demonstrates that FacilitySource was justified in paying Sigmund slightly more than Woods.  Unlike Woods, Sigmund attended college and had some prior experience in sales and in supervising and training other employees.  Given that such education and experience was relevant to FacilitySource's hiring and wage decisions, see Hayden Decl., ¶ 8; Second Hayden Decl., ¶¶ 2-18, defendants have established a legitimate basis for the wage differential between Woods and Sigmund.  See Brousard-Norcross, 935 F.2d at 979 (Equal Pay Act not violated by marginal wage differential where employer had "legitimate factors upon which to base salary differentials"); Amos v. McNairy Cnty., 997 F.Supp.2d 889, 898 (W.D. Tenn. 2014) (holding that wage discrimination claim is not established where plaintiff cannot show that "'he and his proposed comparators were similar in all relevant respects'") (quoting Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 751 (6th Cir. 2012)).

Thus, defendants are entitled to summary judgment on plaintiffs' wage discrimination claims.

### D.    Other Alleged Discriminatory Actions

In addition to alleging wage discrimination, plaintiffs assert that defendants discriminated against them by: failing to promote them, failing to give them pay raises, decreasing Woods's job responsibilities, and "isolating" them.

Employment discrimination claims require a showing of an adverse employment action, which is defined as a "materially adverse change in the terms and conditions of [plaintiff's] employment."  Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999).  A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" does not constitute an adverse employment action.  Smith v. City of Salem, Ohio, 378 F.3d 566, 575 (6th Cir. 2004) (internal quotation marks omitted).  "Examples of adverse employment actions include firing, failing to

12

promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation." Id. at 575-76 (citing cases).

### 1.      Failure to Promote

A plaintiff asserting a failure to promote claim must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied. White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 240 (6th Cir. 2005).

Plaintiffs allege that after they became accounts managers, defendants wrongfully failed to promote them to the position of senior account manager. Defendants argue that plaintiffs are unable to establish a *prima facie* case because Woods was not qualified for the position and Lorenzo did not apply for it.

The court agrees with defendants and finds that plaintiffs cannot establish a *prima facie* case in support of their failure to promote claim. Undisputed evidence establishes that among the prerequisites of the senior account manager position was a bachelor's degree, "preferably in Business or [a] related field." Second Hayden Decl., Ex. 1. Woods does not have such a degree, see Woods Aff., ¶ 23, and thus was not qualified for the position.

Lorenzo admits that he never applied for a senior account manager position. See Lorenzo Dep., pp. 10-11; Lorenzo Aff., ¶ 22. However, he contends that the position was not posted. See Lorenzo Dep., pp. 10-11; but see Myers Dep., pp. 52-53 (human resources director testifying that openings in positions were posted internally by email). Lorenzo argues that when the position was filled, he was passed over in favor of two individuals, Kathleen Kinzig and Bill Esposito, whom he claims had lesser qualifications than he did. Lorenzo Dep., pp. 10-15.

Defendants are entitled to summary judgment on Lorenzo's failure to promote claim because he cannot satisfy the fourth element of his claim. With respect to Kinzig, FacilitySource has demonstrated that it never hired her as a senior account manager. Kinzig worked as an account manager, earning $42,600 at the time of her departure in December 2010. See Doc. 71, Page ID 1158. Despite Lorenzo's apparent belief that she was made senior account manager during a restructuring, see Lorenzo Dep., pp. 10-11, Kinzig was not promoted to senior account manager. See Second Hayden Decl., ¶ 20. With respect to Esposito, FacilitySource has demonstrated that he had better qualifications, namely five years of sales experience, than did Lorenzo, who had no sales

experience.  See id., ¶ 21; Lorenzo Dep., pp. 20-21 (stating that he understood that FacilitySource did not promote him to senior account manager because of his lack of "face time" with clients).

### 2.      Failure to Receive a Raise

Plaintiffs allege that they were discriminated against because they did not receive merit raises. As defendants point out, this assertion is unsupported and is contradicted by the record.  Plaintiffs allege that things changed for the worse once Wagner and Smith were put in management positions in July 2009 and July 2010 respectively.  However, FacilitySource gave merit raises to Woods in April 2010, April 2011 and June 2012.  See Woods Dep., Ex. 7; Jividen Decl., ¶ 2.  And FacilitySource gave merit raises to Lorenzo in April 2010, June 2012 and May 2014.  See Lorenzo Dep., Ex. 20; Jividen Decl., ¶¶ 2, 3.  Plaintiffs have not attempted to show that other account managers received raises at times when plaintiffs did not.  See Jividen Decl., ¶ 4 (stating that FacilitySource gave no merit raises to its employees in 2013).

### 3.      Demotion in Job Responsibilities

A reduction in material job responsibilities may qualify as an adverse action.  See Smith, 378 F.3d at 575-76.  Without much explanation, plaintiffs allege in their brief that Woods suffered a "significant demotion in responsibilities."  Doc. 68, p. 16.  Woods's deposition testimony on the matter was not entirely clear, but he indicated that he was removed from one or more of the client accounts to which he was assigned.  See Woods Dep., pp. 107-112.  In an affidavit, Woods identifies two client accounts from which he was removed – SCI and TCP.  See Woods Aff., ¶ 38.

With respect to SCI, plaintiffs are unable to show that FacilitySource took an adverse action against Woods.  Woods admits that he voluntarily took himself off of the account: "SCI wanted a dedicated account manager, and my understanding was that they wanted me to be their dedicated Account Manager, but I wanted to manage more than that one account, so I did not remain as their dedicated Account Manager."  Woods Aff., ¶ 38; see also  Doc. 68, p. 17 (statement in plaintiffs' brief that Woods "voluntarily left one account because [the client] wanted a dedicated [Account Manager]").  Because the reduction in job responsibilities in this instance resulted from Woods's own choice, it does not constitute an adverse employment action taken by the employer.

With respect to TCP, plaintiffs are unable to show that the action resulted in a materially adverse change in the terms and conditions of Woods's employment.  Woods states that he was removed from the account for the purported reason that the client was not satisfied with him and asked for him to be removed.  See Woods Aff., ¶ 38; Woods Dep., p. 110.  Woods could not say

whether this reason was accurate, but did state that TCP was "unhappy with FacilitySource in general" and ended its account with FacilitySource. See Woods Aff., ¶ 38; Woods Dep., p. 110.

After Woods was removed from the TCP account, Smith assigned Woods to two additional accounts and assigned him to a backup role for two other accounts. See Woods Dep., pp. 115-18. The two new accounts concerned "lower profile clients" than TCP in terms of store count, but Woods testified that the new assignments "worked out well" and his overall job demands were "consistent." Id., pp. 115, 118. "It's consistent because it's deliverables, it's a client. They have a lower store count, but that doesn't change their level of expectations for us to deliver or execute. And then also, too in my backup role to Aeropostale and GNC it's consistent." Id., p. 118. So while his client assignments changed, Woods's job responsibilities still included handling several client accounts, in both primary and backup roles. At most then, Woods was subjected to an alteration in his responsibilities and not to a materially adverse change in the terms and conditions of his employment. For that reason, his claim fails. See Smith, 378 F.3d at 575.

### 4. "Isolation" of Plaintiffs[5]

Plaintiffs allege that they were "isolated, tracked, and not allowed to participate in events" and that their "advancement has been impeded though lack of support and disassociation." Doc. 68, p. 16. In connection with this allegation, plaintiffs contend that: defendants discouraged co-workers from associating with plaintiffs, defendants had a higher level of expectations for Woods and kept closer track of him than of other workers; Woods was not allowed to take breaks in a public area on the second floor of their office building; defendants steered clients away from interacting with plaintiffs when clients visited the office; defendants did not "support" plaintiffs; and plaintiffs were excluded from a company golf outing in September 2012.

The court finds that a significant portion of the plaintiffs' purported evidence in support of their claim of isolation has not been submitted in a form sufficient to oppose the motion for summary judgment. See Fed. R. Civ. P. 56(c)(4). Certain evidence submitted by plaintiffs is speculative, see Dunham Aff., ¶ 10 (co-worker stating in affidavit, without providing a foundation, "I could tell if I had associated with Nick and Gary, I would not have been promoted."), and other evidence is hearsay, see Myers Dep., p. 45 (testifying that another employee told him that she had concerns about Wagner telling her to check in on Woods's whereabouts). Further, plaintiffs cite to

---

[5]  Plaintiffs present the allegations of isolation as supporting both a traditional discrimination claim as well as a hostile work environment claim. The court will analyze the allegations under both legal theories.

statements in affidavits that merely restate some of the allegations being made.  See Emmons v. McLaughlin, 874 F.2d 351, 358 (6th Cir. 1989) (holding that affidavits that "merely repeated the vague and conclusory allegations" are "insufficient to generate a genuine issue of material fact."). For instance, in support of the proposition that defendants discouraged coworkers from associating with plaintiffs, Woods states, without example or elaboration, "Defendants also encouraged coworkers to dissociate with me and treated coworkers that did associate with me poorly."  Woods Aff., ¶ 26; accord Lorenzo Aff., ¶ 17.  For the proposition that defendant expected more out of him than of other account managers, Woods states, again without example or elaboration, that "Duane Smith and Jordan Wagner had a different, higher, level of expectations and demands for me." Woods Aff., ¶ 26.  See also Woods Aff., ¶¶ 39, 61 (restating the assertions that Woods did not receive "support" from defendants and was "tracked" by defendants); Lorenzo Aff., ¶ 18, 22 (restating the assertions that Woods was "treated worse than other employees" and that Lorenzo did not receive "support" from defendants); Dunham Aff., ¶ 10 (co-worker stating, "I knew they [Woods and Lorenzo] were treated differently").  These blanket assertions appear in affidavits that were submitted after a deposition of Woods was taken in which he did not raise the assertions even upon being asked if there was "anything you want to add" to the claim of discrimination beyond matters relating to compensation.  Woods Dep., p. 107.

Certain other evidence does not stand for the factual proposition for which plaintiffs assert it does.  For instance, plaintiffs cite the deposition testimony of account manager Zach Stewart for the proposition that defendants told co-workers not to associate with Woods.  But Stewart testified to the opposite -- that defendants did not discourage him from associating with Woods.  See Stewart Dep., pp. 49, 61, 68.  Plaintiffs also cite Stewart's deposition for the proposition that Wagner harassed individuals who were friends with Woods, but Stewart testified that Wagner did not treat him differently because of his friendship with Woods.  See id., pp. 31, 46-47.  Finally, plaintiffs contend that defendants "isolated" plaintiffs, but Stewart testified that he was not told to stop interacting with plaintiffs and did not observe them being isolated.  See id., pp. 49, 60-61, 68, 70.

The court now turns to the evidence that is in admissible form and does at least partially support plaintiffs' allegations.  Plaintiffs have submitted evidence that one employee, market coordinator Albrey Mann, was told by Smith, "[P]eople see who you talk to and who you hang around."  Mann Aff., ¶ 12.  Mann believed that Smith meant this statement to refer to Woods and Lorenzo.  See id.  Even so, Mann does not state or even suggest that she actually stopped interacting with plaintiffs.  Further, even if Mann did stop interacting with Woods and Lorenzo, plaintiffs have

not explained how Smith's statement to a lone employee resulted in a materially adverse change in the terms and conditions of their employment. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (holding that an adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

In that same vein, Mann states that she saw Wagner "make a scene about where Gary was one day when he was not at his desk." Mann Aff., ¶ 10. Plaintiffs argue that this occurrence shows that defendants "tracked" plaintiffs. However, this single event does not establish that Woods was subjected to a materially adverse change in the terms and conditions of his employment. See Foster v. Michigan, 573 Fed. App'x 377, 394 (6th Cir. 2014) ("De minimis actions are not materially adverse.").

Plaintiffs next cite the affidavit of an employee, Kevin Dunham, who worked at Facility Source for two months in 2012. He states that he witnessed Woods working "extra hours" and taking calls outside of work. Dunham Aff., ¶ 10. Plaintiffs cite the affidavit for the proposition that defendants had a higher level of expectations for Woods. However, plaintiffs have not attempted to establish that Woods was the only employee who worked extra hours or took calls outside of work. Nor have they attempted to show that defendants required Woods to do so. The affidavit simply states that Dunham witnessed Woods doing these things; plaintiffs have not shown, even by way of Woods's own deposition testimony, that Woods was required to perform extra work.

Next, plaintiffs have submitted evidence that Smith told Woods not to go to a public area on the second floor of the building where employees commonly took breaks. See Woods Dep., p. 171. But plaintiffs have failed to establish that Woods was the only employee to whom Smith gave this instruction. See id., pp. 175-76 (admitting that he did not know if Smith told other employees not to take breaks on the second floor). More importantly, by Woods's own concession, this instruction was overturned by human resources director Brent Myers, who decided that employees could still take breaks on the second floor. See id., pp. 173-74. In that regard, plaintiffs have again failed to show how the alleged discriminatory conduct resulted in a materially adverse change in the terms and conditions of their employment.[6]

---

[6] Plaintiffs have not submitted evidence indicating for how long Smith's instruction that Woods not take breaks on the second floor lasted. In any event, plaintiffs do not allege that Woods was unable to take any breaks whatsoever in the time period from when Smith gave his instruction until Myers reversed it.

Plaintiffs next cite evidence that defendants did not introduce clients to Woods. The evidence is sparse on this point. Woods states without further elaboration, "When clients were brought into the office, they were often walked past me unless the client asked to talk to me or the client was black." Woods Aff., ¶ 26. Again, plaintiffs fail to explain how this conduct impacted the terms and conditions of Woods's employment. Woods does not assert that the clients at issue were ones that were, or could have been, assigned to him.

Returning to the assertion that defendants did not support plaintiffs, Woods testified that he once had a client for whom he inquired of Smith about the client's eligibility to participate in a couple of incentive programs that FacilitySource was running. See Woods Dep., pp. 144-48 (lighting program and snow and ice management program). Woods stated that Smith initially did not respond to his inquiry and that Smith later said that management had pre-determined who could participate in the lighting program. Id., pp. 145, 202. On a more general level, Woods and Lorenzo both testified that defendants did not come to talk to them about how their work was going or how they could help plaintiffs in their work. Id., p. 145 (stating that defendants did not have a proper "level of engagement"); Lorenzo Dep., pp. 49-52.

The court finds that the testimony concerning an alleged lack of support from management does not establish a *prima facie* case of discrimination. Lorenzo testified that he and Woods were not the only ones that defendants failed to support. See Lorenzo Dep., pp. 50, 136-39 (stating that defendants also did not interact with Caucasian account manager Rick Edwards and Caucasian market coordinator Albrey Mann). Further, plaintiffs testified that they were successful in performing their job duties, despite the alleged lack of support, and that they were independent workers who did not need much support and could communicate important information to management in other ways. See Woods Dep., pp. 116, 148, 280-81, 286; Lorenzo Dep., pp. 52, 55, 117, 145. Indeed, the record demonstrates that FacilitySource expected "autonomy" from its account managers. See Woods Dep., Ex. 11, PAGE ID 509 and Lorenzo Dep., Ex. 30, PAGE ID 626 (FacilitySource's performance review form that included as an area of evaluation the category of "autonomy," which included the ability to work "independently" and "with a minimum of follow-up"; Woods and Lorenzo self-scored themselves as "outstanding" in this category). Plaintiffs may not have preferred defendants' management style, but they have not demonstrated that the "lack of engagement" materially altered their terms and conditions of employment. See Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999) (an employment action is not materially adverse simply because it made the employee unhappy).

18

Finally, plaintiffs claim that their exclusion from a golf outing in September 2012 was an actionable act of discrimination. This assertion is unavailing. Plaintiffs contend in their brief that they were the only account managers not invited to attend the outing, but the evidence demonstrates that at least five other account managers, each Caucasian, were not invited to attend. Compare Doc. 71, PAGE ID 645 and 737 (lists of invitees) with Doc. 71, PAGE ID 1158 (list of account managers). Thus, of the 13 account managers employed as of September 2012, 7 were not invited: Gary Woods, Nicolas Lorenzo, Jill Eberhardt, Mark Malenik, June Tracy, Kitty Wood, and Stephen Zerucha.[7] See id.

Further, plaintiffs have not shown that their exclusion from the golf outing was an adverse employment action. Plaintiffs stated in their affidavits that being excluded from the golf outing limited their networking opportunities, even though plaintiffs did not testify as such in their depositions. See Woods Aff., ¶ 36; Lorenzo Aff., ¶ 20. With neither plaintiff having provided any further explanation in their affidavits as to how the exclusion limited their networking opportunities, it is difficult to see how exclusion from one event caused a materially adverse change in the terms and conditions of their employment, particularly when defendants have demonstrated that the golf outing was followed by a dinner that both plaintiffs were invited to and did in fact attend. See Lorenzo Dep., p. 128.

In sum, the claims concerning the various acts of "isolation" do not establish a *prima facie* case of discrimination.

### E.      Hostile Work Environment

Plaintiffs have brought claims under Title VII and § 1981 for hostile work environment. These claims are analyzed under the a five-factor test by which plaintiffs must demonstrate that: (1) they belonged to a protected group, (2) were subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1078-79 (6th Cir. 1999).

Defendants focus on the third and fourth elements in their motion for summary judgment. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the

---

[7]  In the chart found at Doc. 71, PAGE ID 737, David Sigmund is listed as an invitee to the golf outing and his position is labeled as account manager. However, it is undisputed that he did not become an account manager until January 2013. See Doc. #71, PAGE ID 1158 and 1346.

circumstances." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The court should consider the totality of harassment "by all perpetrators combined" rather than "divid[ing] and categoriz[ing] the reported incidents." Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999). Even so, "the third element limits the scope of this analysis: only harassment based on the plaintiff's race may be considered." Williams v. CSX Transp. Co., Inc., 643 F.3d 502, 511 (6th Cir. 2011). "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." Id.

Plaintiffs contend that defendants "interacted negatively on a regular basis with Plaintiffs," Doc. 68, p. 19, as well as engaged in racially-offensive conduct. With regard to negative interactions, plaintiffs refer to the allegations of isolation discussed above. With regard to racially offensive remarks by defendant Wagner, plaintiffs have submitted evidence that he used the phrase "you people" once when talking to Woods. Woods Dep., p. 212-13. As to defendant Smith, plaintiffs submit evidence that Smith told Woods that "you people are cheeky" and "you people are dramatic" and said something suggesting that Woods liked fried chicken and Kool-Aid. Woods Aff., ¶¶ 30, 58. They also contend that Smith made separate comments over the years to Woods that he looked like Dizzy Gillespie, had "nappy" hair, and was a "dark cloud." See Woods Dep., pp. 218-20, 224-28. Further, Smith once placed his leg on Woods's desk in a sexually suggestive manner. See Woods Aff., ¶ 57. And Smith once rubbed Woods's head in his chest and later commented about how hair coloring dye from Woods's hair had rubbed off on Smith's shirt. See Woods Dep., pp. 191-92.

The court will begin its analysis by identifying alleged treatment for which plaintiffs have not created a genuine issue of fact that it was based on race. Defendants correctly point out that this includes much of the alleged harassment, particularly the "negative interactions." The only allegation of isolation that has even minimal support as being racially-based is that defendants often walked client past Woods "unless the client asked to talk to [Woods] or the client was black." Woods Aff., ¶ 26. Plaintiffs have not submitted evidence, either direct or comparative, to support an inference that the remaining alleged acts of isolation were race-based. See Lorenzo Dep., pp. 50, 136-39 (stating that defendants did not interact with Caucasian account manager Rick Edwards and Caucasian market coordinator Albrey Mann); Doc. #71, PAGE ID 645 and 737 (showing that five Caucasian account managers were not invited to the September 2012 golf outing; Woods Dep., pp. 175-76 (conceding that he did not know if Smith told other employees not to take breaks on the second floor).

20

Turning to the alleged racially-offensive remarks, the court finds that a jury could find that each was based on race.  The only remark challenged by defendants at summary judgment is the "you people" comment made by Wagner.  It is true that a "you people" statement can be ambiguous.  See Arnold v. Marous Bros. Constr., Inc., 211 Fed. App'x 377, 380 (6th Cir. 2006).  Defendants argue that since co-worker Zach Stewart was present when Wagner made the comment that Wagner was referring to both of them.  See Woods Dep., p. 212.  However, Woods testified that Wagner singled him out and "was only speaking to me" when he said "you people."  Id.

In contrast, plaintiffs have not linked the two alleged instances of offensive behavior to race.  Plaintiffs have not provided any context to either occurrence.  Woods states that Smith "placed his leg on my desk in a sexually suggestive manner while I was seated at my desk."  See Woods Aff., ¶ 57; see also Woods Dep., p. 194 (mentioning in passing that Smith "put his crotch in my face").  And Woods declined an opportunity to explain the "situation with Duane having your head in his chest" by responding, "I don't know," and stating that the "end result" was that his hair coloring product to hide gray hair came off on Smith's shirt.  Woods Dep., pp. 191-92.  Though one might view the behavior as inappropriate, there is no support on the record before the court that it was based on race.  See Stewart Dep., pp. 58-59 (testifying that he had seen Smith rub other employees' heads in his chest in a joking manner).

To summarize, the following conduct could be found to be based on race: defendants made several "you people" comments to Woods, including "you people are cheeky" and "you people are dramatic"; Smith suggested that Woods liked fried chicken and Kool-Aid; Smith said that Woods looked like Dizzy Gillespie, had "nappy" hair, and was a "dark cloud"; and defendants often walked clients visiting the office past Woods unless they were black.

The court now must determine whether that conduct was so severe or pervasive as to alter the conditions of employment and create an abusive working environment.  Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23.  "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

The court finds that there is not sufficient evidence from which a jury could reasonably find that the conduct satisfies the severe or pervasive standard.  As with many of the allegations in this

case, plaintiffs do not provide much, if any, context to the alleged offensive conduct.[8]  Even when viewed collectively, the conduct amounts to occasional offensive comments.  There were no alleged threats and no alleged physical harm.  "Occasional offensive utterances do not rise to the level required to create a hostile work environment."  CSX Transp., 643 F.3d at 511.

While the comments could be found to be racially insensitive and offensive, their severity and impact on plaintiffs' ability to perform work should be viewed in light of the evidence concerning the tolerance at plaintiffs' workplace for joking around and being "outrageous."  Woods Dep., p. 217.  Woods testified that he, his co-workers, and defendants liked to "kick back and cut up," Woods Dep., p. 158, and "to be outrageous" while "in good fun," id., p. 218.  Woods once had a picture of Smith and Zach Stewart that he labeled as Milli Vanilli, after the lip synching music duo of the late 1980s, and sent the picture to Smith.  Id., pp. 155-56.  Woods gave a pink cowboy hat to Smith because he thought Smith was a "good, old, country boy."  Id., p. 216-17.  Woods testified that they would try "to be [as] crazy outrageous as we could be[,] that's why we went with the pink hat."  Id., p. 217.  See also id., pp. 157-58 (testifying that "we took one of the client coordinators [and a client] out to a strip club" and that it was all "in good fun"); Stewart Dep., pp. 42-43, 58-59 (testifying as to the joking nature of the workplace).

Plaintiffs have not put forth evidence from which a jury could reasonably find that the alleged offensive conduct interfered with their ability to perform their work.  Even with the allegation that defendants walked clients past Woods, plaintiffs have not attempted to explain or show how it interfered with Woods's ability to perform his work for the clients to which he was assigned.

Accordingly, defendants are entitled to summary judgment on plaintiffs' hostile work environment claims.

## IV.    Conclusion

Defendants' motion for summary judgment (doc.  60) is GRANTED.  Plaintiffs' motion to strike defendants' "Notice of Errata" (doc. 77) is DENIED AS MOOT, as the court did not rely on the Notice of Errata in reaching its decision on summary judgment.

The court notes that remaining in this suit is defendants' counterclaim for fraudulent inducement.  Defendants have represented that they are not seeking damages from the counterclaim but asserted the counterclaim because they believed it would provide grounds for the equitable

---

[8]  Again, plaintiffs rely heavily on affidavits containing brief one-sentence assertions on matters for which Woods's deposition contained little or no testimony.

remedy of rescission and establish an alternate basis for dismissing plaintiffs' employment discrimination claims.  See Doc.  55, p. 2.

 Defendants shall advise the court within 14 days of this order as to whether they intend to pursue their counterclaim.


       s/ James L. Graham   
       JAMES L. GRAHAM
       United States District Judge

DATE: January 20, 2015